UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GINA R. BELLINGER, on behalf of herself and as trustee for the JOHN A. BELLINGER 2018 FAMILY TRUST and the GINA R. BELLINGER 2010 TRUST, and JOHN W. BELLINGER, as trustee for the LAUREN V. BELLINGER 2018 FAMILY TRUST and the JOHN W. BELLINGER 2010 TRUST,<br><br>                  Plaintiffs,<br><br>    - against -<br><br>LABORATORIES TOPCO LLC, WARBURG PINCUS (CALLISTO) PRIVATE EQUITY XII (CAYMAN), L.P., WARBURG PINCUS (EUROPA) PRIVATE EQUITY XII (CAYMAN), L.P., WARBURG PINCUS (GANYMEDE) PRIVATE EQUITY XII (CAYMAN), L.P., WARBURG PINCUS PRIVATE EQUITY XII-B (CAYMAN), L.P., WARBURG PINCUS PRIVATE EQUITY XII-D (CAYMAN), L.P., WARBURG PINCUS PRIVATE EQUITY XII-E (CAYMAN), L.P., WP XII PARTNERS (CAYMAN), L.P., WARBURG PINCUS XII PARTNERS (CAYMAN), L.P., and TILIA FUND I AIV, L.P.,<br><br>                  Defendants. | Civil Action No. |

## <u>COMPLAINT</u>

Plaintiffs Gina R. Bellinger, on behalf of herself and as trustee for the John A. Bellinger 2018 Family Trust and the Gina R. Bellinger 2010 Trust, and John W. Bellinger, as trustee for the Lauren V. Bellinger 2018 Family Trust and the John W. Bellinger 2010 Trust (together, "Plaintiffs" or "Bellingers"), by and through their undersigned counsel, for their Complaint against Laboratories Topco LLC ("Certified Group" or "Company"), Warburg Pincus (Callisto)

Private Equity XII (Cayman), L.P., Warburg Pincus (Europa) Private Equity XII (Cayman), L.P.,

Warburg Pincus (Ganymede) Private Equity XII (Cayman), L.P., Warburg Pincus Private Equity

XII-B (Cayman), L.P., Warburg Pincus Private Equity XII-D (Cayman), L.P., Warburg Pincus

Private Equity XII-E (Cayman), L.P., WP XII Partners (Cayman), L.P., Warburg Pincus XII

Partners (Cayman), L.P. (collectively referred to as "Warburg"), Tilia Fund I AIV, L.P. ("Tilia",

and collectively with the Company and Warburg, the "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.      This action arises out of Defendants' flagrant breaches of contract and deceitful

misrepresentations and concealment in connection with Plaintiffs' $100 million investment into

Certified Group, one of Warburg's and Tilia's portfolio companies, and a "leading provider of

laboratory testing and regulatory consulting services to the food, nutraceuticals, personal care,

and nicotine end-markets."

2.      The Bellingers are the second largest equity members of Certified Group.  Based

on Defendants' promises and representations, the Bellingers invested $100 million into Certified

Group (the "Investment") in connection with their sale of FSNS Holdings, LLC (collectively

with its subsidiaries, "FSNS") to Certified Group in July 2021.[1]

3.      Prior to Plaintiffs' Investment, John and Gina Bellinger owned and operated

FSNS for nearly three decades.  Since its founding in 1994, FSNS has become North America's

premier provider of accredited and quality microbiological, chemical and nutritional laboratory

testing in the food and beverage industries.  Warburg repeatedly targeted FSNS as a potential

---

[1] Prior to Certified Group's acquisition, in July 2021, Food Safety Net Ltd. and its related companies were restructured to form FSNS Holdings, LLC, which is the parent holding company of all FSNS entities.  The Bellingers then sold 100% of the membership interest of FSNS Holdings, LLC to Laboratories Bidco, LLC, a subsidiary of Laboratories Topco, LLC.  For the purposes of this Complaint, all references to "FSNS" herein refer to FSNS Holdings, LLC and its predecessor entities.

acquisition target from 2017 until late 2020, but John and Gina Bellinger consistently refused to sell the company they had worked tirelessly over decades to build.

4.      In April 2021, however, Warburg and Tilia approached the Bellingers with a new and enticing proposal:  Plaintiffs would sell FSNS to a Certified Group subsidiary and then invest a portion of the proceeds of that sale into Certified Group, a company Warburg and Tilia touted as a leader in the laboratory testing industry for cosmetics and nicotine products.

5.      Warburg and Tilia capitalized upon their existing relationships with the Bellingers and the Bellingers' desire to break into a new laboratory testing market to induce the Bellingers to make the investment.  Beginning in April 2021, Defendants, through their agents, represented to the Bellingers that Certified Group provided FSNS with the opportunity to diversify its services using existing, experienced and quality laboratories throughout the country.  In doing so, Defendants repeatedly misrepresented the state and condition of Certified Group's existing finances, infrastructure and qualification of its personnel.  Defendants also failed to disclose material facts prior to the closing of the sale of FSNS and the Investment on July 23, 2021 (the "Closing").

6.      Defendants' representations to Plaintiffs were egregiously false.  At the time Defendants made the representations to Plaintiffs, Defendants and their agents knew that (i) Certified Group lacked a basic operational infrastructure, such as centralized Information Technology, and billing or quality control divisions; (ii) at least two of Certified Group's labs, including ABC Testing, lacked validated testing methods, potentially misleading customers and exposing the Company to legal and reputational risks; and (iii) the FDA had issued warning letters and citations against at least two of Certified Group's labs, including ABC Testing and

Microconsult.  These intentionally concealed issues were of a staggering magnitude for a company in Certified Group's position.

7.      Had Defendants actually disclosed these critical issues involving Certified Group's business and operations, it would have been abundantly clear that Defendants' representations regarding the strength of the Company's existing EBITDA and its plans for future growth were also materially false.  Indeed, in the months following the Closing, the Company's EBITDA quickly declined as the Company was forced to spend enormous amounts of capital to correct noncompliant testing methods and quality issues that were rampant throughout the Certified Labs.

8.      Ultimately, Defendants' misrepresentations and deceit induced Plaintiffs to invest $100 million into Certified Group.  Had Defendants disclosed the true nature of Certified Group's operations and finances, Plaintiffs would not have made any investment, let alone the $100 million Investment.  As a direct consequence of Defendants' unlawful conduct, Plaintiffs have suffered many millions of dollars in damages.

## PARTIES

9.      Gina R. Bellinger ("Gina" or "Mrs. Bellinger") is an individual domiciled in the State of Texas.  Mrs. Bellinger is the trustee for the John A. Bellinger 2018 Family Trust and the Gina R. Bellingers 2010 Trust and is fully authorized to act on their behalf.

10.     John W. Bellinger ("John" or "Mr. Bellinger") is an individual domiciled in the State of Texas.  Mr. Bellinger is the trustee for the Lauren V. Bellinger 2018 Family Trust and the John W. Bellinger 2010 Trust and is fully authorized to act on their behalf.

11.     Laboratories Topco LLC is a limited liability company organized and existing under the laws of the State of Delaware.

4

12. Warburg Pincus (Callisto) Private Equity XII (Cayman), L.P., is an exempted limited partnership organized and existing under the laws of the Cayman Islands ("WP XII Callisto").

13. Warburg Pincus (Europa) Private Equity XII (Cayman), L.P. is an exempted limited partnership organized and existing under the laws of the Cayman Islands ("WP XII Europa").

14. Warburg Pincus (Ganymede) Private Equity XII (Cayman), L.P. is an exempted limited partnership organized and existing under the laws of the Cayman Islands ("WP XII Ganymede").

15. Warburg Pincus Private Equity XII-B (Cayman), L.P. is an exempted limited partnership organized and existing under the laws of the Cayman Islands ("WP XII-B").

16. Warburg Pincus Private Equity XII-D (Cayman), L.P. is an exempted limited partnership organized and existing under the laws of the Cayman Islands ("WP XII-D").

17. Warburg Pincus Private Equity XII-E (Cayman), L.P. is an exempted limited partnership organized and existing under the laws of the Cayman Islands ("WP XII-E").

18. WP XII Partners (Cayman), L.P. is an exempted limited partnership organized and existing under the laws of the Cayman Islands ("WP XII Partners").

19. Warburg Pincus XII Partners (Cayman), L.P. is an exempted limited partnership organized and existing under the laws of the Cayman Islands ("Warburg Pincus XII Partners").

20. Tilia Fund I AIV, L.P. is a limited partnership operating in Illinois.

## JURISDICTION AND VENUE

21. This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1331.

5

22.    This Court has supplemental jurisdiction of the state law claims pursuant to 28 U.S.C. § 1367.

23.    This Court has personal jurisdiction over Defendant Certified Group because it is duly organized under the laws of the State of Delaware and it consented to jurisdiction under Paragraph 8 of the Subscription Agreement, as defined below.  The Court has personal jurisdiction over the remaining Defendants because they consented to jurisdiction under Paragraph 8 of the Subscription Agreement, as defined below.  Additionally, each of the Defendants engaged in continuous and systematic business in Delaware and purposefully availed themselves of this forum, and Plaintiffs' claims arise out or relate to Defendants' contacts with this forum.

24.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)-(d).

## FACTS

### A. Background

25.    John and Gina Bellinger founded FSNS in 1994 to provide microbiological, chemical and nutritional laboratory testing services to customers in the food and beverage industries.  FSNS is headquartered in San Antonio, Texas, and operates a large network of ISO 17025 and A2LA accredited laboratories in the United States, Canada and Mexico.

26.    FSNS grew significantly under Mr. and Mrs. Bellinger's stewardship over the past two decades.  It is a leader of food safety testing in North America, and provides testing services to some of the largest food suppliers in the world.

27.    In light of its success, FSNS has been an acquisition target for several strategic investors and private equity firms since approximately 2005.

28.    Warburg, a global private equity firm with over $85 billion in assets under management, first expressed an interest in investing in or acquiring FSNS in or about November

2017.  On at least three occasions from late November 2017 until December 2020, the Bellingers, through Mr. Bellinger, and Warburg, through one of its Managing Directors, Stephanie Geveda ("Geveda"), discussed Warburg's interest in a potential investment into or purchase of FSNS.  The Bellingers declined to sell on each occasion but grew to trust Geveda and maintained a relationship with her.

**B.  <u>The Bellingers Invest in Certified Group</u>**

29.    Beginning in or around 2018, Warburg and Tilia, a Chicago-based private investment firm focusing on the food and nutrition supply chain, partnered to acquire several analytical laboratories serving the food, beverage and dietary supplement industries.  Johannes Burlin, the co-founder of Tilia, has known Mr. Bellinger for several years and has interacted with him on numerous occasions given Tilia's focus on the food and beverage industry.

30.    Ultimately, the laboratories that Warburg and Tilia acquired were consolidated to form Certified Group, a Warburg and Tilia portfolio company which provides "laboratory testing and regulatory consulting services to the food, nutraceuticals [*e.g.* dietary supplements], personal care, and nicotine end-markets."[2]  Warburg and Tilia are each members of Certified Group.

31.    Upon information and belief, between 2018 and April 2021, Certified Group grew to ten laboratories across North America, including, without limitation, EAS Consulting, Labstat, LabSmart, ABC Testing, Microconsult Inc., and Micro Quality Laboratories (together, the "Certified Labs").

---

[2] *See* https://warburgpincus.com/investments/certified-group/; *see also* https://tiliallc.com/portfolio/ (describing Certified Group as a "[l]eading North American provider of analytical chemistry, microbiology, toxicology, and regulatory consulting services to multiple consumer product end markets, including food & beverage, nutritional supplements, e-cigarettes & other nicotine products and cannabis.").

32.     Upon information and belief, prior to the Company's purchase of FSNS, the Certified Labs continued to operate independently from one another and lacked the operational infrastructure and personnel required to successfully maximize Warburg's and Tilia's returns.  In or around Spring 2021, Warburg and Tilia made yet another attempt to purchase FSNS in order to obtain the infrastructural and operational support and experienced employees that Certified Group lacked and FSNS possessed.

33.     Having previously failed to entice the Bellingers to sell FSNS to Warburg, Geveda used her existing relationship with the Bellingers, including her special knowledge of the Bellingers' concerns pertaining to a sale, to strategically reframe the purchase proposal and ultimately induce Plaintiffs to invest into Certified Group.

34.     In or around April 2021, Geveda and Johannes Burlin ("Burlin"), co-CEO and co-founder of Tilia, approached Mr. Bellinger with the following proposal: the Bellingers would sell FSNS to Certified Group and would in turn invest $100 million into Certified Group, which Mr. Bellinger would run as the Chief Executive Officer.  At the time, Geveda and Burlin were on the Board of Managers ("Board") for Certified, appointed by Warburg and Tilia, respectively.

35.     At no time in April 2021, or prior to the Closing, did Defendants or their representatives inform Plaintiffs that Certified Group actually needed the acquisition of FSNS to obtain the necessary infrastructure, operations and personnel to successfully operate the Certified Labs, which, unbeknownst to the Bellingers, were not operating properly.  Although Burlin and Geveda told Mr. Bellinger in April 2021 that they wanted him to replace Steven Mitchell as the CEO of Certified Group, Burlin and Geveda only explained that Defendants needed to replace Mitchell because he failed to travel to oversee the labs during the COVID pandemic and were silent about any concerns regarding his performance or the performance of the Certified Labs.

36.     At that time, Geveda and Burlin pitched to Mr. Bellinger that the Bellingers'
investment into Certified Group would be valuable, by stating that the Company would provide
FSNS with the opportunity to diversify its services and expand into other more profitable
industries.  The Bellingers were interested in this new proposal because they knew that labs in
the nicotine and cosmetic testing industry typically had higher EBITDA margins than labs in the
food and beverage industry and had been looking to expand FSNS into other more profitable
industries for some time.

37.     Geveda and Burlin, who were both on the Company's Board of Managers, were
well aware of the Bellingers' interest in expanding FSNS into new and more profitable industries
and repeatedly touted the financial performance of the existing Certified Labs to induce the
Bellingers to make the Investment, at the expense of omitting material facts regarding the
Company's true condition and failing to provide an honest full picture of the deteriorating state
of the Company's business.

38.     Indeed, throughout their discussions with Mr. Bellinger in April of 2021, Geveda
and Burlin highlighted the Certified Labs' EBITDA performance, representing that the Certified
Labs' current finances were significantly stronger than those of FSNS, and that the Certified
Labs' finances would continue to grow over the next several years.  Also, in April 2021, Geveda
and Burlin represented to Mr. Bellinger that the Certified Labs were running smoothly and
continued to highlight the Investment as an opportunity to continue FSNS' growth.

39.     John Bellinger conveyed to Gina Bellinger each and every representation made by
Geveda and Burlin in April 2021.  In reliance on these representations, the Bellingers decided to
move forward with the deal and began their negotiations over the sale of FSNS and investment
into Certified Group in or around May 2021.

40.     At all relevant times during the negotiation and due diligence process from May until June 2021, and continuing to the present, Warburg and Tilia, through Geveda, Burlin and their counsel, repeatedly failed to respond to the Bellingers' requests for documents and information regarding the Company.  Indeed, Defendants did not respond to the Bellingers' requests for information for several weeks and ultimately refused to provide the Bellingers with any documentation regarding the financials or other information regarding the Certified Labs.  At the same time, however, Geveda and Burlin, on behalf of the Defendants, continued to reiterate their April 2021 representations that the Certified Labs had strong EBITDA, that the investment provided FSNS with the opportunity for growth, and that Certified Labs had no material operational or performance issues.  Given that the Certified Labs reported generating approximately $160 million in revenue (and FSNS generated approximately $110 million in revenue at the time) and the Bellingers' trust in Geveda and Burlin, the Bellingers had no reason to doubt Defendants' representations.

41.     In or around early June 2021, the parties learned that rumors about a potential acquisition of FSNS had circulated within the industry.  Out of concern that a premature announcement could cause damage to both companies, Plaintiffs were forced to accelerate their negotiations in June 2021.  Defendants continued to refuse to provide Plaintiffs with the requested documentation and pressured Plaintiffs to rapidly invest into Certified Group on an accelerated timetable.

**C.  The Subscription Agreement**

42.     On June 28, 2021, Mrs. Bellinger, the John A. Bellinger 2018 Family Trust, the John W. Bellinger 2010 Trust, the Gina R. Bellinger 2010 Trust, and the Lauren V. Bellinger 2018 Family Trust entered into a subscription agreement with Certified Group whereby Plaintiffs

agreed to invest $100,000,000 in exchange for Class A Units of Certified Group (the

"Subscription Agreement").[3]

43.     Certified Group warranted in the Subscription Agreement that it did not violate

any applicable Law, as defined in the respective agreements, in connection with Plaintiffs'

investment into Certified Group.

44.     Specifically, pursuant to Section 4(c) of the Subscription Agreement, Certified

Group represented and warranted the following:

> . . . (iii) none of the (A) execution and delivery by Parent of this
> Agreement, (B) compliance by Parent with any of the provisions
> hereof, or (C) consummation by Parent of the transactions
> contemplated hereby, will (1) result in any material violation of any
> Law applicable to Parent . . .
>
> (v) at the Closing, subject to the Subscribers having executed the
> Parent LLC Agreement, the Purchased Units will be issued by
> Parent in compliance with applicable securities laws or exemptions
> therefrom . . . and in compliance with the provisions of the Parent
> LLC Agreement[.]

45.     The Subscription Agreement defines "Law" as "any federal, state, provincial,

foreign, supranational, national or local statute, law, ordinance, rule (including rules of common

law), regulation, Order, permit, authorization or other legal requirement."  Accordingly, the term

"Law" includes, without limitation Section 10(b) of the Securities Exchange Act and Rule 10b-5

thereunder as well as the Texas Securities Act.

46.     Moreover, although Certified Group disclaimed that it provided any

representations to Plaintiffs in connection with the Investment, except as set forth in Section 4 of

the Subscription Agreement, Certified Group expressly agreed that the disclaimers would not

---

[3] Earlier that same day, Plaintiffs and Mr. Bellinger, on behalf of themselves and FSNS, entered into a
purchase agreement with Laboratories Bidco LLC, a subsidiary of Certified Group ("Buyer"), whereby
Buyer purchased all of the assets and outstanding equity securities of FSNS.

apply with respect to fraud.  Section 8(i)(1) of the Subscription Agreement defines "Fraud" as "an intentional and fraudulent misrepresentation or omission committed by a party to this Agreement with respect to the representations and warranties of such party under this Agreement, with specific intent to deceive or mislead and with actual knowledge of such misrepresentation or omission."

47.    Pursuant to Section 8(a)(1) of the Subscription Agreement, the parties further agreed to the exclusive jurisdiction of the federal Court of the State of Delaware for any disputes arising in connection with the Subscription Agreement so long as the Court of Chancery for the State of Delaware declines jurisdiction or cannot assert jurisdiction (as is the case here).

**D.  <u>The Bellingers' Discovery of the Breach</u>**

48.    The sale of FSNS to Certified Group closed on July 23, 2021 (the "Closing"). Immediately thereafter, the Bellingers invested $100,000,000 into Certified Group pursuant to the Subscription Agreement.

49.    Mr. Bellinger assumed his role as CEO of Certified Group on or about July 23, 2021.  Within approximately two weeks of the Closing and the Investment, Mr. Bellinger discovered that the Company's representations in Section 4(c)(iii) of the Subscription Agreement were false because, among other things, the Company made material misrepresentations and omitted material facts in connection with the Investment in violation of applicable federal and state law, including Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder as well as the Texas Securities Act.  Specifically, the representations that Warburg and Tilia made on behalf of Certified Group regarding the Company's finances and operations were patently false.

50.    *First*, in early August 2021, Jim Neary ("Neary"), Managing Director for Warburg and Co-Head of U.S. Private Equity, told Mr. Bellinger for the first time that Certified

Group did not have the infrastructure to support the basic operations of its ten existing labs.
Prior to the acquisition of and without FSNS, the Certified Labs did not have centralized quality
control or testing standards, qualified personnel, or the operational infrastructure required to run
their businesses, including a centralized finance or IT department, all of which Plaintiffs
reasonably expected a Company of its size to have in place.  The Company also failed to disclose
the significant harm caused to Certified Group by its former CEO, and instead framed his refusal
to travel (before, during and after the COVID-19 pandemic) as the reason for ousting him.
Indeed, Plaintiffs would not have invested $100 million into Certified Group had Defendants
properly disclosed that the Company's basic operational infrastructure was significantly
inadequate to expand its business to the extent Defendants had falsely promised Mr. Bellinger.

51.     *Second*, Warburg and Tilia also failed to disclose to Plaintiffs that several of the
Company's labs, including ABC Testing, did not use validated testing methods.

52.     Validated testing is the cornerstone of any laboratory testing service and a basic
requirement for a laboratory to receive, and continue to receive, the required accreditations and
market itself to third-party customers.  The lack of a validated testing method is material not only
to the Company's revenues, but also to the representations the Company and its employees make
to existing and potential customers concerning the quality and reliability of the testing services
that the customers purchase.  Accordingly, the lack of a validated testing method significantly
impacts a company's performance, as was the case here.

53.     As a result of the lack of a validated testing method within certain Certified Labs,
the Company was forced to spend significant time and resources immediately following the
Closing to enhance its testing procedures and methods to ensure that the labs did not continue to
violate any existing regulations or laws or misrepresent their services to customers.  Plaintiffs

would not have invested $100 million into Certified Group had Defendants disclosed that the Certified Labs did not use validated testing methods.

54.     *Finally*, Defendants failed to disclose that two of the Certified Labs – ABC Testing and Microconsult – were the subject of FDA Form 483 citations as a result of their invalidated testing methods and various other violations.[4]

55.     Specifically, ABC Testing had been the subject of several FDA warning letters prior to the Closing of the transactions, including, without limitation, a warning letter issued on June 4, 2019 which enumerates a non-exhaustive list of violations including ABC Testing's noncompliant testing methods, data records and systems controls.  Notwithstanding this warning letter, ABC Testing failed to cure the issues cited by the FDA and the FDA issued several citations in March 2021 relating to the very same issues it raised in 2019, including inadequate qualified personnel, lack of routine equipment calibration, unverified and deficient test methods, incomplete testing records, lack of proper systems controls and deficient specifications for drug product containers.

56.     Microconsult was also subject to several citations as a result of an FDA inspection on May 20, 2022, including poor site maintenance, procedure deviations, unestablished test methods and deficient testing records.  Although this May 20, 2022 inspection took place after the Closing, the underlying issues cited in the citation were in existence, and caused by events that occurred, prior to Defendants' first pitch to Mr. Bellinger in April 2021.

---

[4] An FDA Form 483 is issued to FDA-regulated firms at the conclusion of an inspection when an investigator has observed any conditions that in their judgment may constitute violations of FDA rules and regulations.  The Form 483 is not exhaustive as there may be other objectionable conditions that may still exist although they were not visible at the time of inspection.

57.     Defendants had knowledge of the FDA citations and warning letters issued to ABC Testing and Microconsult's operational issues in at least April 2021.  However, neither the FDA citations and warning letters nor the facts underlying the citations or warning letters were disclosed to Plaintiffs prior to the Closing.  Instead, Defendants continued to represent to Plaintiffs that Certified Group and its affiliated laboratories were accredited and high-quality laboratory testing facilities that complied with all applicable rules and regulations.  Plaintiffs would not have invested $100 million into Certified Group had Defendants disclosed that the Certified Labs did not use validated testing methods, among other issues.

**E.  Plaintiffs Were Damaged by Defendants' Misconduct**

58.     Plaintiffs suffered a significant economic loss by virtue of Defendants' breaches of contract and fraudulent misrepresentations.

59.     Plaintiffs' loss includes, without limitation, lost profits and the amount that Plaintiffs overpaid for their investment into the Company, which amounts to no less than $100 million, as a result of being defrauded into investing in a financially unstable Company with subpar noncompliant regulatory frameworks, poorly managed and unqualified personnel and severely below budget revenues.

**COUNT I**
**Breach of Contract – Subscription Agreement**
**(As Against Laboratories Topco LLC )**

60.     Plaintiffs reassert and reallege each and every allegation contained in Paragraphs 1-59 outlined above as if fully set forth herein.

61.     The Subscription Agreement is a valid and enforceable contract between Mrs. Bellinger, the John A. Bellinger 2018 Family Trust, the John W. Bellinger 2010 Trust, the Gina R. Bellinger 2010 Trust, the Lauren V. Bellinger 2018 Family Trust, and Certified Group.

62.     Plaintiffs have complied with all material terms of the Subscription Agreement.

63.     Pursuant to Section 4(c)(iii) of the Subscription Agreement, Certified Group represented and warranted to Plaintiffs that, as of the date of the Agreement and as of the date of Closing, "none of the . . . compliance by Parent with any of the provisions thereof, or [ ] consummation by Parent of the transactions contemplated hereby, will [ ] result in any material violation of any Law applicable to Parent."

64.     Certified Group breached its representations and warranties in the Subscription Agreement because as of the date of the Agreement and the Closing, the Company, through its representatives at Warburg and Tilia, engaged in material violations of law to induce Plaintiffs to enter into the Agreement, including by violating Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder as well as the Texas Securities Act.

65.     As further set forth above, Certified Group, through its agents, Geveda and Burlin, falsely stated to Plaintiffs that Certified Group, and its underlying labs, had high EBITDA margins and failed to mention material violations involving the affiliated labs. Defendants made the material misrepresentations of fact with the intent to deceive, manipulate or defraud Plaintiffs into investing $100 million into the Company.  Defendants also knowingly, or recklessly, omitted and concealed material facts about the Certified Labs, including the fact that (i) ABC Testing, including, without limitation, the fact that the lab's testing methods were not validated, that the lab was subject to FDA warning letters and citations, and that the lab's founder was manufacturing results and had to be terminated; and (ii) Microconsult's noncompliant testing methods and deficient records.  These and other misrepresentations materially violated applicable law, including Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder as well as the Texas Securities Act.

16

66.    Plaintiffs made the Investment to the Company in reliance upon Certified Group's representations regarding the Company's material compliance with existing laws.

67.    As a direct and proximate cause of Certified Group's breach of the Subscription Agreement, Plaintiffs have incurred damages including, without limitation, direct costs incurred as a result of the breach, lost profits and the amount that Plaintiffs overpaid for the Company, which amounts to no less than $100 million.

## COUNT II
## Fraudulent Misrepresentation
### (As Against All Defendants)

68.    Plaintiffs reassert and reallege each and every allegation contained in Paragraphs 1-67 outlined above as if fully set forth herein.

69.    The Company, through Warburg's and Tilia's representatives, Geveda and Burlin, falsely misrepresented to the Bellingers that the Company had a high EBITDA while omitting and concealing material facts about existing problems with the Certified Labs.

70.    Defendants, through their agents Geveda and Burlin, made the material misrepresentations of fact with the knowledge or belief that their statements were false.

71.    Defendants knowingly, or recklessly, omitted and concealed material facts about the Certified Labs, including the fact that (i) ABC Testing's testing methods were not validated, that the lab was subject to FDA warning letters and citations, and that the lab's founder was manufacturing results and had to be terminated; and (ii) Microconsult's noncompliant testing methods and deficient records, among other violations.

72.    Defendants had the intent to induce Plaintiffs to act by investing $100 million into the Company.

73.     Plaintiffs invested $100 million into the Company in reliance upon Defendants' representations that they complied with applicable law and regarding the Company's EBITDA and their omission of material facts relating to the unvalidated and underperforming labs.

74.     As a direct and proximate of Defendants' fraudulent misrepresentations and omissions, Plaintiffs suffered an economic loss, including, without limitation, direct costs incurred as a result of the breach, lost profits and the amount that Plaintiffs overpaid for the Company, which amounts to no less than $100 million, as a result of being defrauded into investing in a financially unstable Company with subpar regulatory frameworks, poorly managed and unqualified personnel and severely below budget revenues.

75.     As a result, Plaintiffs are also entitled to an award of punitive damages, in an amount to be determined at trial, because the aforementioned fraudulent acts of the Defendants were willful, malicious, gross, oppressive, or aggravated, and reflected a breach of the Bellinger's trust and confidence in the Defendants.

**COUNT III**
**<u>Fraud</u>**
**<u>In violation of Section 10(b) of the Securities Exchange Act, codified at 15 U.S.C. § 78j, and Rule 10b-5, codified at 17 CFR 240.10b-5</u>**
**(As Against All Defendants)**

76.     Plaintiffs reassert and reallege each and every allegation contained in Paragraphs 1-75 outlined above as if fully set forth herein.

77.     The Subscription Agreement is an investment contract between Mrs. Bellinger, the John A. Bellinger 2018 Family Trust, the John W. Bellinger 2010 Trust, the Gina R. Bellinger 2010 Trust, the Lauren V. Bellinger 2018 Family Trust, and Certified Group.

78. The Company, through Warburg's and Tilia's representatives, Geveda and Burlin, falsely misrepresented to Plaintiff John Bellinger that the Company had a high EBITDA while omitting and concealing material facts about existent problems with the Certified Labs.

79. Defendants, through their agents Geveda and Burlin, made the material misrepresentations of fact with the knowledge or belief that their statements were false.

80. Defendants knowingly, or recklessly, omitted and concealed material facts about the Certified Labs, including the fact that (i) ABC Testing's testing methods were not validated, that the lab was subject to FDA warning letters and citations and that the lab's founder was manufacturing results and had to be terminated; and that (ii) Microconsult's noncompliant testing methods and deficient records, among other violations.

81. Defendants made the misrepresentations or omitted the material facts to induce induce the Plaintiffs to invest $100 million into the Company.

82. Plaintiffs invested $100 million into the Company in reliance upon Defendants' representations regarding the Company's EBITDA and their omission and concealment of material facts relating to the unvalidated and underperforming labs.

83. As a direct and proximate Defendants' fraudulent misrepresentations and omissions, Plaintiffs suffered an economic loss, including, without limitation, direct costs incurred as a result of the breach, lost profits and the amount that Plaintiffs overpaid for the Company, which amounts to no less than $100 million, as a result of being defrauded into investing in a financially unstable Company with subpar regulatory frameworks, poorly managed and unqualified personnel and severely below budget revenues.

**COUNT IV**
**Fraud**
**In violation of Tex. Gov't Code Ann. § 4008.052 _et seq._**
**(As Against All Defendants)**

84.    Plaintiffs reassert and reallege each and every allegation contained in Paragraphs 1-83 outlined above as if fully set forth herein.

85.    The Subscription Agreement is an investment contract between Mrs. Bellinger, the John A. Bellinger 2018 Family Trust, the John W. Bellinger 2010 Trust, the Gina R. Bellinger 2010 Trust, the Lauren V. Bellinger 2018 Family Trust, and Certified Group.

86.    The Company, through Warburg and Tilia representatives, Geveda and Burlin, falsely misrepresented to Plaintiff John Bellinger that the Company had a high EBITDA while omitting and concealing material facts about existent problems with the Certified Labs.

87.    Defendants, through their agents Geveda and Burlin, made the material misrepresentations of fact with the knowledge or belief that her statements were false.

88.    Defendants knowingly, or recklessly, omitted and concealed facts about the Certified Labs, including the fact that (i) ABC Testing's testing methods were not validated, that the lab was subject to FDA warning letters and citations, and that the lab's founder was manufacturing results and had to be terminated; and that (ii) Microconsult's noncompliant testing methods and deficient records, among other violations.

89.    Defendants had knowledge of, or in alternative, would have had knowledge of the material misrepresentations or omissions of fact had they exercised reasonable care.

90.    Defendants made the misrepresentations or omitted the material facts to induce induce the Plaintiffs to invest $100 million into the Company.

91.     Plaintiffs invested $100 million into the Company in reliance upon Defendants' representations regarding the Company's EBITDA and their omission and concealment of material facts relating to the unvalidated and underperforming labs.

92.     As a direct and proximate of Defendants' fraudulent misrepresentations and omissions, Plaintiffs suffered an economic loss, including, without limitation, direct costs incurred as a result of the breach, lost profits and the amount that Plaintiffs overpaid for the Company, which amounts to no less than $100 million, as a result of being defrauded into investing in a financially unstable Company with subpar regulatory frameworks, poorly managed and unqualified personnel and severely below budget revenues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter an order:

a)     An award of compensatory damages for the foregoing claims, plus interest, fees, and costs as allowed by law, or such other sum as may be proven at trial;

b)     An award of rescissory damages for the foregoing claims, plus interest, fees, and costs as allowed by law, or such other sum as may be proven at trial;

c)     An award of punitive damages;

d)     An award of pre- and post-judgment interest to the extent applicable;

e)     Awarding Plaintiffs their reasonable attorneys' fees, expenses, and costs;

f)     Awarding such other relief as the Court deems just and proper.

Dated: June 26, 2023

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

By: */s/Kevin M. Coen*
Kevin M. Coen (#4775)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19801
Telephone: (302) 351-9301
Facsimile: (302) 425-3097

-and-

KASOWITZ BENSON TORRES LLP
Marc E. Kasowitz (*pro hac vice* motion forthcoming)
Albert Shemmy Mishaan (*pro hac vice* motion forthcoming)
Melissa A. Barahona (*pro hac vice* motion forthcoming)
1633 Broadway
New York, NY 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

*Attorneys for Plaintiffs*