## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

GINA R. BELLINGER, on behalf of herself )
and as trustee for the JOHN A. )
BELLINGER 2018 FAMILY TRUST and )
the GINA R. BELLINGER 2010 TRUST, )
and JOHN W. BELLINGER, as trustee for )
the LAUREN V. BELLINGER 2018 )
FAMILY TRUST and the JOHN W. )
BELLINGER 2010 TRUST, )
                                     )
           Plaintiffs, )
                                      )
          v. )         C.A. No. 23-695-RGA
                                      )
LABORATORIES TOPCO LLC, )
WARBURG PINCUS (CALLISTO) )
PRIVATE EQUITY XII (CAYMAN), L.P., )
WARBURG PINCUS (EUROPA) PRIVATE )
EQUITY XII (CAYMAN), L.P., )
WARBURG PINCUS (GANYMEDE) )
PRIVATE EQUITY XII (CAYMAN), L.P., )
WARBURG INCUS PRIVATE EQUITY )
XII-B (CAYMAN), L.P., WARBURG )
PINCUS PRIVATE EQUITY XIID )
(CAYMAN), L.P., WARBURG PINCUS )
PRIVATE EQUITY XII-E (CAYMAN), )
L.P., WP XII PARTNERS (CAYMAN), L.P., )
WARBURG PINCUS XII PARTNERS )
(CAYMAN), L.P., and TILIA FUND I AIV, )
L.P., )
                                      )
          Defendants. )

FILED

JAN 3 1 2024

U.S. DISTRICT COURT DISTRICT OF DELAWARE

### REPORT AND RECOMMENDATION

Plaintiffs Gina Bellinger, personally and as trustee of two personal and family trusts, and

John Bellinger, as trustee of two personal and family trusts, sued Defendants Laboratories Topco

LLC ("Topco"), various Warburg Pincus private equity entities (collectively "Warburg"), and Tilia

Fund I AIV, L.P. ("Tilia") following Plaintiffs' investment in Topco, a portfolio company of

Warburg and Tilia. (D.I. 1). Pending before the Court are two motions to dismiss: one by Warburg and Topco together (D.I. 12), and one by Tilia (D.I. 15). The motions are fully briefed. (D.I. 13, 16, 21, 25, 26). For the following reasons, I recommend that Defendants' motions be GRANTED-IN-PART and DENIED-IN-PART.

## I.      BACKGROUND

This dispute arises out of Plaintiffs' $100 million investment in Topco. Topco is a Delaware LLC that was formed to consolidate and hold several analytical laboratories purchased by private equity firms Warburg and Tilia. (D.I. 1 ¶¶ 11, 28–29). These labs serve the food, beverage, and dietary supplement industries. (*Id.* ¶ 29). Prior to the investment in Topco, the Bellingers owned and operated FSNS, an LLC that provided microbiological, chemical, and nutritional laboratory testing for the food and beverage industries. (*Id.* ¶¶ 2–3). According to Plaintiffs, Warburg targeted FSNS for acquisition beginning in 2017, but the Bellingers consistently declined to sell the company. (*Id.* ¶ 3).

In April 2021, Warburg and Tilia, through their respective representatives Stephanie Geveda and Johannes Burlin, approached the Bellingers regarding a series of transactions whereby the Bellingers would sell FSNS to, and then invest $100 million in, Topco. (*Id.* ¶ 34). Mr. Bellinger would then serve as Topco's CEO. (*Id.*). The Bellingers decided to move forward with the deal, and Plaintiffs entered into a subscription agreement (the "Subscription Agreement" or "Agreement") whereby Plaintiffs invested a total of $100 million in Topco. (*Id.* ¶ 42).

The Bellingers soon became dissatisfied with their investment. Plaintiffs allege that within two weeks of the sale of FSNS and their investment in Topco, Mr. Bellinger, as CEO, discovered that Topco was in poorer condition and had worse prospects than Plaintiffs understood when agreeing to the deal. (*Id.* ¶¶ 48–56). Plaintiffs then filed this action asserting a breach of contract

claim against Topco, and common law fraud, securities fraud under federal law, and securities fraud under Texas law claims against Topco, Warburg, and Tilia. (*Id.* ¶¶ 60–92). Plaintiffs allege that Defendants misrepresented "the state and condition of [Topco's] existing finances, infrastructure, and qualification of its personnel" and deliberately failed to disclose material facts while negotiating the transactions. (*Id.* ¶ 5). They further allege that they would not have gone through with the transactions had they been aware of Topco's true condition and prospects and that they have suffered millions of dollars in damages as a result of Defendants' bad acts. (*Id.* ¶ 8). All Defendants have moved to dismiss. (D.I. 12, 15).

## II.     LEGAL STANDARD

In reviewing a motion filed under Rule 12(b)(6), the Court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff." *Phillips v. Cnty. Of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotations omitted).  A Rule 12(b)(6) motion may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court concludes that those allegations "could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).  The complaint generally need not contain detailed factual allegations, but conclusory allegations and "formulaic recitation[s] of the elements of a cause of action" are insufficient to give the defendant fair notice of the nature of and grounds for the claim. *Twombly*, 550 U.S. at 555.  The complaint must plead facts sufficient to show that a claim has "substantive plausibility." *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) (per curiam).  While this plausibility standard requires more of the complaint than allegations supporting the mere possibility that the defendant is liable as alleged, plausibility should not be taken to mean probability. *Twombly*, 550 U.S. at 545. A claim is facially plausible, and the standard is satisfied,

when the claim's factual allegations, accepted as true, allow the court to reasonably infer that the defendant is liable as alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 1948 (2009).

## III.    DISCUSSION

Plaintiffs allege that Topco breached the Subscription Agreement and that all three Defendants engaged in common law fraud and violated the Securities Exchange Act and the Texas Securities Act. I address each count in order, recommending dismissal with respect to the breach of contract claim against Topco and the common law fraud claim against all Defendants.

### a.    Breach of Contract

In Count I, Plaintiffs allege that Topco breached its obligations under the Subscription Agreement. (D.I. 1 ¶¶ 60–67). The Subscription Agreement provides in relevant part that "none of the (A) execution and delivery by [Topco] of this Agreement, (B) compliance by [Topco] with any of the provisions hereof, or (C) consummation by Topco of the transactions contemplated hereby, will (1) result in any material violation of any Law applicable to [Topco] . . . ." (D.I. 14-1 § 4(c)(iii)). Plaintiff claims that Topco breached this provision of the Subscription Agreement because it allegedly made false representations for the purpose of inducing Plaintiffs to invest in the Company, which Plaintiffs claim amounts to a violation of at least the Securities Exchange Act and the Texas Exchange Act. (D.I. 1 ¶¶ 60–67).

A breach of contract claim under Delaware[1] law requires a claimant to "plead (1) the existence of a contractual obligation; (2) a breach of that obligation; and (3) damages resulting from the breach." *Buck v. Viking Holding Mgmt. Co. LLC*, C.A. No. 20C-08249-AML-CCLD,

---

[1]    The Subscription Agreement provides that Delaware law applies. (D.I. 14-1 § 8(d)). No party has argued otherwise, so I will apply Delaware law to evaluate the sufficiency of Plaintiffs' claim.

2021 WL 673459, at *3 (Del. Super. Feb. 22, 2021) (citing *VLIW Tech, LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)).

As an initial matter, I note that Plaintiffs' breach of contract claim appears to be an improperly bootstrapped claim. In *Prairie Cap. III, L.P. v. Double E Holding Corp.*, the Delaware Court of Chancery considered a breach of contract claim where, as here, the plaintiff "purport[ed] to allege a failure to comply with applicable law by citing the same acts that it claims constitute fraud under other sections of the [contract]." 132 A.3d 35, 59 (Del. Ch. 2015). The court noted that, "[i]f [the plaintiff] proves its case, those wrongs can be addressed under the other sections," and found that "[t]hey do not give rise to a separate breach of [the contract]." *Id.* Similarly, Plaintiffs' breach of contract claim is (among other things) entirely dependent on the success of one of the other causes of action—proof of its either of its securities claims—and Plaintiffs can obtain a remedy through one of those causes of action if they are able to prove their case. Accordingly, there is no independent breach of contract claim here, and that alone warrants dismissal of Count I.

Even if the independence of the contract claim were not at issue, however, I am not convinced that Plaintiffs have adequately stated a breach of contract claim as a matter of law given the agreed-upon terms of the Agreement. Topco points out that the "parties also agreed that Topco *did not authorize* any person to make any representation or warranty regarding itself and its businesses and operations." (D.I. 13 at 24) (citing D.I. 14-1 § 8(i)(2)(A) ("[N]o Person has been authorized by [Topco] to make any representation or warranty regarding [Topco or its business, assets, or operations] . . . the Purchased Units, or otherwise, and if made, such representation or warranty may not be relied upon as having been authorized by [Topco].")). Topco is correct that Plaintiffs do not allege actions taken by Topco in the Complaint—just Topco's "agents."

In addition, Topco argues the representation and warranty in question "does not give rise to any contractual obligation predicated on extra-contractual statements because Plaintiffs explicitly agreed [in the Subscription Agreement] not to rely on any extra-contractual representations or omissions of fact." (D.I. 13 at 25–26). Topco references three additional anti-reliance provisions as support, which read in relevant part:

> [The Subscription Agreement], the Purchase Agreement, the Parent LLC Agreement and the Parent RRA, and the respective annexes, schedules and exhibits thereto, constitute the entire agreement among the parties with respect to the subject matter hereof and thereof, and supersede all other prior and contemporaneous agreements and understandings, both written and oral, among the parties or any of them with respect to the subject matter hereof and thereof.

(D.I. 14-1 § 8(b));

> No party is making any representation or warranty of any kind or nature whatsoever to any other party hereto, oral or written, express or implied, with respect to the transactions contemplated by this Agreement, except those representations and warranties expressly made by such party set forth in Section 4 hereof, and each party hereby disclaims any such other representations or warranties with respect to the transactions contemplated by this Agreement.

(*Id.* § 8(i)(1)); and

> [A] Subscriber shall not at any time assert any claim against [Topco] . . . for any inaccuracies, misstatements or omissions with respect to the information furnished . . . concerning [Topco or its business] or the Purchased Units, other than any inaccuracies or misstatements in the representations and warranties expressly made by [Topco] in Section 4(c) hereof.

(*Id.* § 8(i)(2)(F)). Plaintiffs respond that Topco cannot rely on these clauses because the statements giving rise to the breach of contract claim are fraudulent (D.I. 21 at 22), relying upon *Online HealthNow, Inc. v. CIP OCL Investments, LLC* for the proposition that "[u]nder Delaware law, a party cannot invoke provisions of a contract it knew to be an instrument of fraud as a means to avoid a claim grounded in that very same contractual fraud." C.A. No. 2020-0654-JRS, 2021 WL 3557857, at *2, *19 (Del. Ch. Aug. 12, 2021).

I am persuaded that the anti-reliance provisions bar Plaintiffs' breach of contract claim and that *Online HealthNow* does not advance Plaintiffs' argument. Plaintiffs correctly assert that courts sometimes refuse to enforce provisions of a contract that are instruments of fraud to avoid claims grounded in the same contractual fraud. However, Plaintiffs' claim is not one for fraud in the inducement, where a court might more closely scrutinize the enforceability of the anti-reliance language. This claim is for breach of contract—claiming that agents of Topco, not even Topco itself, failed to do or disclose something that it should have resulting in violations of law—so the anti-reliance provisions apply here. *See, e.g., Online HealthNow*, 2021 WL 3557857, at *14 n.169 (citing *Shenandoah Life Ins. Co. v. Valero Energy Corp.*, C.A. No 1988-9032, 1988 WL 63491, at *9 (Del. Ch. June 21, 1988) ("When the action is for breach of contract and not for fraud in the inducement of the investment, provisions of this kind are effective to limit any liability that may be found to the issuer."); *LaSalle Nat'l Bank v. Perelman*, 141 F. Supp. 2d 451, 461 (D. Del. 2001) ("[T]he Chancery Court generally held that no recourse provisions are limited to contract claims . . . ."); *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del. Ch. 1992) ("[T]he no recourse provision does not bar equitable claims."); *Mabon, Nugent & Co. v. Tex. Am. Energy Corp.*, C.A. No. 1988-8578, 1988 WL 5492, at *3 (Del. Ch. Jan. 27, 1988) ("Plaintiffs' remaining claims are not contractual and, therefore, the restrictions in the Indenture['s non-recourse clause] do not apply.")). The relevant anti-reliance provisions disclaim extra-contractual representations and warranties and memorialize the parties' agreement that nobody had been authorized by Topco to make other representations or warranties on its behalf. (D.I. 14-1 §§ 8(b), 8(i)(1), 8(i)(2)(A), 8(i)(2)(F)). Because Plaintiffs' breach of contract claim is ultimately based on extra-contractual statements made by Ms. Geveda and Mr. Burlin, the anti-reliance provisions bar the claim as a matter of law. I accordingly recommend dismissal of Count I.

### b. Common Law Fraud

In Count II, Plaintiffs allege fraudulent misrepresentation on the part of all Defendants. (D.I. 1 ¶¶ 68–75). To state a claim for common law fraud under Delaware law, a plaintiff must allege that: "(1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance." *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006). Thus, "[c]ommon law fraud can occur in three ways: (1) overt misrepresentation; (2) silence in the face of a duty to speak; or (3) deliberate concealment of material facts." *Transdigm Inc. v. Alcoa Glob. Fasteners, Inc.*, C.A. No. 7135-VCP, 2013 WL 2326881, at *6 (Del. Ch. May 29, 2013). Claims for fraud must be plead with particularity. Fed. R. Civ. P. 9(b).

Defendants argue that the Subscription Agreement's anti-reliance provisions preclude Plaintiffs' common law fraud claims. (D.I. 13 at 28). Plaintiffs, on the other hand, argue that they allege deliberate concealment of material facts and that Delaware courts have declined to enforce anti-reliance provisions under such circumstances. (D.I. 21 at 24–26). I am not persuaded that Plaintiffs have adequately plead fraud by deliberate concealment, however. "When a fraud claim is based on active concealment, 'the plaintiff must show that a defendant took some action affirmative in nature designed or intended to prevent, and which does prevent, the discovery of facts giving rise to the fraud claim, some artifice to prevent knowledge of the facts or some representation intended to exclude suspicion and prevent inquiry.'" *Transdigm*, 2013 WL 2326881, at *6 (quoting *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854

8

A.2d 121, 150 (Del. Ch. 2004)).  Here, Plaintiffs allege that Defendants concealed material information (*e.g.* D.I. 1 ¶ 6), but they do not allege specific affirmative acts that would meet the pleading standard required by Rule 9(b).  Plaintiffs perhaps come closest by alleging that Defendants failed to respond to requests for information and to provide certain documentation while continuing to make misrepresentations. (*Id.* ¶ 40).  But the Delaware Court of Chancery has found that a refusal to provide information is not an affirmative act of concealment when a sophisticated investor had a contractual right of inspection and reason to believe it would be wise to exercise it. *Metro Commc'n*, 854 A.2d at 151.  Plaintiffs here may not have had a contractual right of inspection at the time of the alleged concealment, but they could have refused to go through with the investment absent additional information. *Id.* at 152 (refusing to accept the argument that "a sophisticated party can uncritically accept rosy depictions of obvious warning signs, and that a court of equity will later shield it from the consequences of its own lackadaisical approach to protecting its multimillion-dollar investment.").  The fact that Plaintiffs requested the information in the first place suggests they believed it important to their decision-making process, and their decision to proceed without it is, as in *Metro Communication*, a failure of due diligence rather than an affirmative act of concealment.

Even if Plaintiffs had properly plead fraud by deliberate concealment, I remain unconvinced that the anti-reliance provisions are unenforceable in this case.  Plaintiffs cite a family of cases that have declined to enforce anti-reliance clauses in general when a plaintiff pleads fraud based on deliberate concealment of material facts. *See Sofregen Med. Inc. v. Allergan Sales, LLC*, No. CVN20C03319EMDCCLD, 2021 WL 1400071, at *5 (Del. Super. Apr. 1, 2021); *Wind Point Partners VII-A, L.P. v. Insight Equity A.P. X Co., LLC*, C.A. No. 19C-08260-EMD-CCLD, 2020 WL 5054791, at *15–17 (Del. Super. Aug. 17, 2020).  When an anti-reliance provision explicitly

9

disclaims the accuracy or completeness of any information provided outside the representations and warranties in the contract, however, Delaware courts have taken a different view. *See RAA Mgmt., LLC v. Savage Sports Holdings, Inc.*, 45 A.3d 107, 110 (Del. 2012) (enforcing an anti-reliance clause that disclaimed "the accuracy or completeness of the Evaluation Material or of any other information concerning the company . . . ," and stating that "[o]nly those representations or warranties that are made to a purchaser in the Sale Agreement . . . shall have any legal effect."). The Court of Chancery recognized this distinction in *Transdigm* in declining to enforce an anti-reliance clause where the anti-reliance clause merely stated that "Buyer has . . . been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed decision with respect to the execution . . . of this Agreement," rather than specifically disclaiming the accuracy and completeness of any information provided outside the contract. 2013 WL 2326881, at *9 (internal quotations omitted). Here, the Subscription Agreement specifically disclaims in Section 8(i)(2)(F) any inaccuracies, misstatements, or omissions aside from those inaccuracies or misstatements in the contract's explicit representations and warranties. This provision is more like the one in *RAA Mgmt.*, which was enforceable, than *Transdigm*, which was not. Accordingly, I find that the Subscription Agreement bars Plaintiffs' common law fraud claims based on extra-contractual statements.

Plaintiffs also argue that the Subscription Agreement carves fraud out of the anti-reliance provision. That may be true in some instances. But the Subscription Agreement defines fraud as "an intentional and fraudulent misrepresentation or omission committed by a party to this Agreement *with respect to the representations and warranties of such party under this Agreement*, with specific intent to deceive or mislead and with actual knowledge of such misrepresentation or omission." (D.I. 14-1 § 8(i)(1)) (emphasis added). Because Plaintiffs allege extra-contractual

10

fraud, the Subscription Agreement's fraud carveout does not apply. Accordingly, the terms of the Subscription Agreement preclude Plaintiffs from adequately stating a claim for common law fraud, and I recommend dismissal of Count II.

### c. Fraud under the Securities Exchange Act

Plaintiffs allege that all Defendants violated the Securities Exchange Act. (D.I. 1 ¶¶ 76–83). To properly plead a claim under the Securities Exchange Act, Plaintiffs must establish that the interests they purchased in Topco are, in fact, securities. *Steinhardt Group Inc. v. Citicorp*, 126 F. 3d 144, 150 (3d Cir. 1997) ("In order to invoke the protections of the federal securities laws, an investor must show, as a threshold matter, that the instrument in question is a security."). If they are not, then Plaintiffs' claim fails.

Per Section 2(1) of the Securities Act of 1933, securities include several categories of instruments, including investment contracts, covering securities interests not otherwise specifically enumerated in the Act. *Id.* Plaintiffs allege that the Subscription Agreement is an investment contract. (D.I. 1 ¶ 77). For a contract or transaction to be an investment contract under federal securities law, the transaction must consist of: (1) "an investment of money," (2) in a common enterprise," (3) "with profits to come solely from the efforts of others." *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946). Defendants dispute only the third element, arguing that the profits of the enterprise would not be derived solely from the efforts of others. (D.I. 13 at 13–14).

In determining whether "profits [] come solely from the efforts of others," courts do not read the term "solely" in an absolute, literal sense. *Steinhardt*, 126 F. 3d at 153. Instead, "an investment contract can exist where the investor is required to perform some duties, as long as they are nominal or limited and would have little direct effect upon receipt by the participant of the benefits promised by the promoters." *Id.* (internal quotations omitted). Courts consider the

11

transaction as a whole, looking at "both the facts of the relationship and the text of the agreements governing the transaction." *Rossi v. Quarmley*, 604 F. App'x 171, 173–74 (3d Cir. 2015). Even when an agreement appears not to be an investment contract on its face based on its allocation of management power, courts look to whether there are plausible allegations that the allocation of management power differed in fact from that contemplated by the agreement. *Id.* at 174.

Defendants argue that Plaintiffs' interests in Topco are not securities because Plaintiffs were active participants in Topco's management and, thus, any profits would not come "solely" from efforts of others. (D.I. 13 at 13–14). In particular, Defendants argue that because Mr. Bellinger became CEO of Topco, and Plaintiffs became managing members, any profits from the enterprise did not come solely from the efforts of other parties. (*Id.*). In advancing their position, Defendants minimize the fact that Mr. Bellinger himself is not a plaintiff by arguing that his role as CEO of Topco in his individual capacity cannot be separated from his role as trustee of the plaintiff trusts. (D.I. 25 at 5–6). Maybe so. But even if Mr. Bellinger's control over Topco as CEO can be imputed to the trusts he represents in this action, Defendants do not explain why that control can likewise be imputed to Mrs. Bellinger or the trusts she represents.

In terms of whether the Subscription Agreement is a security, "the terms of the operating agreement of each LLC will determine whether its membership interests constitute securities." *Great Lakes Chem. Corp. v. Monsanto Co.*, 96 F. Supp. 2d 376, 392 (D. Del. 2000). Here, at first glance, the Subscription Agreement does not appear to be an investment contract. Defendants correctly highlight that Topco is managed by a board of managers and that Plaintiffs are entitled to representation on that board. (D.I. 31 at 82–83). Under some circumstances, this might suggest that Plaintiffs have influence over the success of the company. Here, however, the exhibits

12

submitted by Defendants in connection with their motion to dismiss briefing[2] reveal that Warburg is guaranteed control of the board through its right to appoint a majority of the members. (*Id.*). Therefore, this is not a case where an LLC member, even if not themselves a manager, has the right to unilaterally remove managers. *Cf. Great Lakes*, 96 F. Supp. 2d at 392. Nor is it a case where Plaintiffs' lack of control comes from the risk of being consistently outvoted by a combination of other members. *Cf. Rossi*, 604 F.. App'x at 174. Rather, the governance structure and operating agreement reveal that there is an open question of fact as to whether Plaintiffs' profits from the venture, if any, were to come solely from the efforts of others in practice. While the Court may ultimately find that Plaintiffs' profits are tied to their own involvement, based on the record before me, at this stage of the litigation, I cannot find as such a matter of law and therefore decline to recommend dismissal on this ground.

The threshold question of whether the interests are securities aside, Plaintiffs must still adequately plead fraud to avoid dismissal. To do so, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (quoting *Stoneridge Investment Partners, LLC v.*

---

[2]     The relevant exhibits are properly before the court. "A court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Plaintiffs reference and discuss the contents of the Subscription Agreement in making their claims in the Complaint. (D.I. 1 ¶¶ 42–47). Defendants Topco and Warburg provided the Subscription Agreement along with their motion to dismiss briefing as D.I. 14-1, and the relevant amendments to Topco's operating agreement are attached to the Subscription Agreement. Defendants Topco and Warburg also invited the court to consider the entire operating agreement for context in their reply (D.I. 25 at 4 n.3) and provided a copy as D.I. 31.

*Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).  The allegations must also meet the heightened

pleading  standard  established  the  Private  Securities  Litigation  Reform  Act  ("PSLRA").

*Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009).

The  PSLRA  requires  that  facts  be  plead  with  particularity  and  is  in  most  respects

comparable to the standard established by Rule 9(b).  *Id.* at 253.  Rule 9(b) and the PSLRA require

a plaintiff to plead "the who, what, when, where, and how" when pleading fraud.  *Id.* (quoting *In*

*re Advanta Corp. Securities Litigation*, 180 F.3d 525, 534 (3d Cir. 1999)).  Importantly, while Rule

9(b) allows a plaintiff to plead scienter generally, the PSLRA does not.  *Id.*  Under the PSLRA,

"any private securities complaint alleging that the defendant made a false or misleading statement

must . . . 'state with particularity facts giving rise to a strong inference that the defendant acted

with the required state of mind.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321

(2007) (quoting  15  U.S.C.  §  78u-4(b)(2)(A)).  Alleged  facts  allow  such  an  inference  when,

considering all allegations holistically, "a reasonable person would deem the inference of scienter

cogent and at least as compelling as any opposing inference one could draw from [them]." *Id.* at

324, 326.  "The absence of a motive allegation, though relevant, is not dispositive." *Matrixx*

*Initiatives*, 563 U.S. at 48.

Plaintiffs here allege that Ms. Geveda and Mr. Burlin misrepresented Topco's condition

and financial prospects.  According to the Complaint, they did so by telling Mr. Bellinger that

Topco's previous CEO needed to be replaced because he refused to travel during the COVID-19

pandemic (D.I. 1 ¶ 35) and that Topco was performing well with high growth potential, strong

earnings,  and  no  material  operational  or  performance  issues  (*Id.* ¶ 40).  They  did  so  absent

disclosure by anyone affiliated with Defendants that Topco's CEO actually needed to be replaced

because he had caused the company significant harm (*Id.* ¶ 50), that Topco did not use validated

14

testing methods (*Id.* ¶ 51), and that Topco had received several FDA warning letters (*Id.* ¶ 54). Plaintiffs further allege that, in deciding to invest in Topco, they relied on Ms. Geveda's and Mr. Burlin's representations as to the reasons for replacing the CEO and Topco's condition and performance. (*Id.* ¶¶ 38, 50, 53, 57, 82). Finally, they allege that Defendants[3] made these misrepresentations and omissions to induce Plaintiffs to invest in Topco (*Id.* ¶ 81) and that in doing so they caused Plaintiffs to suffer a significant economic loss (*Id.* ¶¶ 58, 59, 83).

Defendants argue that these allegations are insufficient to state a claim because Plaintiffs have not shown the falsity or materiality of any statement or that Defendants had any duty to disclose any omitted fact. (D.I. 13 at 14–22; D.I. 16 at 7–8). Defendants further argue that the statements Plaintiffs characterize as representations are non-actionable puffery. (D.I. 13 at 16–17). The PSLRA's "materiality requirement is satisfied when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx*, 563 U.S. at 38. There is no affirmative duty to disclose all material information, however; disclosure is only required

---

[3]    To the extent that Defendants argue that Plaintiffs' occasional use of the collective term "Defendants" in the Complaint lacks the requisite specificity, I note that, in general, Plaintiffs specifically allege that both Ms. Geveda and Mr. Burlin made material misrepresentations. Moreover, when alleging omissions, use of the collective term "Defendants" is can be acceptable because the 9(b) pleading standard is relaxed when "the factual information is peculiarly within the defendant's knowledge or control." *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1418 (3d Cir. 1997). Defendants identify one particular alleged misrepresentation for which lack of specificity may be an issue (D.I. 13 at 16–17 ("the alleged statement that 'Certified [] and its affiliated laboratories were accredited and high-quality testing facilities that complied with all applicable rules and regulations,' falls far short of the heightened pleading standards . . . Plaintiffs fail to allege the identity of the purported speaker, when the statement was made, to whom, and under what conditions." (internal citations omitted))), but lack of specificity is not so pervasive in the Complaint that I can conclude that Plaintiffs have not stated any claim as a matter of law.

when it is necessary "to make . . . statements made, in light of the circumstances under which they were made, not misleading." *Id.* at 44 (quoting 17 C.F.R. § 240.10b-5(b)).

At the very least, the allegations that Ms. Geveda and Mr. Burlin misrepresented the reasons for replacing Topco's CEO by providing an incomplete explanation (i.e., that the CEO did not want to travel during COVID-19) while omitting problems with the company under that CEO's leadership meet this standard. They are not the sort of statements that have generally been recognized as puffery by Delaware courts, especially at the motion to dismiss stage. For example, while statements about a potential executive's expertise and suitability for the position may under some circumstances be nonactionable puffery, they may be actionable under other circumstances if made misleading by omission of other relevant information, such as a criminal history. *Kronenberg v. Katz*, 872 A.2d 568, 580 (Del. Ch. 2004). Furthermore, characterization of a statement as nonactionable puffery is often a question of fact, *State ex rel. Jennings v. BP Am. Inc.*, C.A. No. N20C-09-097 MMJ CCLD, 2024 WL 98888, at *23 (Del. Super. Jan. 9, 2024), and on this record I am unwilling to conclude that Ms. Geveda and Mr. Burlin's statements regarding the previous CEO are nonactionable as a matter of law.

Defendants also argue that these statements are not actionable because Plaintiffs did not allege that Ms. Geveda and Mr. Burlin represented that the former CEO's failure to travel was the sole reason for his replacement. (D.I. 13 at 19–20). However, such statements can still be misleading even if they did not claim that failure to travel was the sole reason, however, just as the defendant's statements about the suitability of their chosen candidate for CEO were misleading in the absence of disclosure of his criminal history in *Kronenberg*. *See* 872 A.2d at 580. And, if Plaintiffs' allegations about the state of the company under the former CEO's leadership are true, as I must assume that they are, one can see how the "omitted fact[s] would have been viewed by

16

the reasonable investor as having significantly altered the total mix of information made available." *Matrixx*, 563 U.S. at 38.

The remaining allegations likewise meet the standard. Plaintiffs allege that Ms. Geveda and Mr. Burlin told Mr. Bellinger that Topco was performing well with high growth potential, strong earnings, and no material operational or performance issues (*Id.* ¶ 40). Read together, these statements at least paint an incomplete picture given the alleged problems at Topco. Taking Plaintiffs' allegations as true, the statement that there were no material operational or performance issues is by itself false. Defendants may argue any such statements were immaterial, but misrepresentations and omissions are immaterial as a matter of law only when "the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality." *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 369 n.13 (3d Cir. 1993). Here, I do not find that the alleged misrepresentations and omissions are so obviously unimportant as to warrant dismissal at the Rule 12(b)(6) stage.

Defendants also argue that Plaintiffs fail to state a claim because Plaintiffs do not adequately allege scienter. (D.I. 13 at 22–24; D.I. 16 at 8–9). Plaintiffs allege that Ms. Geveda and Mr. Burlin were members of Topco's managerial board who knowingly gave Mr. Bellinger incomplete information to induce Plaintiffs to invest in Topco. (D.I. 1 ¶¶ 37, 78–81). They further allege that Ms. Geveda and Mr. Burlin refused to respond to requests for documents and information and to provide any documentation regarding Topco's financials while continuing to make incomplete representations. (*Id.* ¶ 40). Ms. Geveda and Mr. Burlin allegedly continued to refuse to provide the requested information and in fact pressured Plaintiffs to invest on an accelerated timetable when the industry caught wind of the potential acquisition. (*Id.* ¶ 41). While they need not necessarily allege a motive, *Matrixx*, 563 U.S. at 48, Plaintiffs nevertheless allege

17

that the purpose of the misrepresentations and omissions was to enable Topco to purchase Plaintiffs' business and thereby "obtain the infrastructural and operational support and experienced employees that [Topco] lacked and [Plaintiffs' business] possessed." (*Id.* ¶ 8). These allegations, considered holistically and presumed true at this stage of litigation, allow an inference that Ms. Geveda and Mr. Burlin were acting knowingly and intentionally, and that inference is at least as compelling as any other at this stage.

Because I find that Plaintiffs' federal securities claim is well-plead, I recommend that Defendants' motions to dismiss Count III be denied.

### d. Fraud under the Texas Securities Act

Plaintiffs also allege that Defendants violated the Texas Securities Act. (*Id.* ¶¶ 84–92). Under the Texas Securities Act, "a person who offers or sells a security and from whom another person buys the security is liable to the buyer of the security . . . if the person offers or sells the security by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading." Tex. Gov't Code Ann. § 4008.052. Here, Defendants simply reference their arguments regarding the sufficiency of Plaintiffs' federal securities claim in arguing that Plaintiffs' claim under the Texas Securities Act fails. Defendants agree that Rule 9(b) provides the appropriate pleading standard, and because I find that Plaintiffs have met the comparable, yet higher, pleading standard provided by the PSLRA, I likewise find that Plaintiffs have plead a sufficient claim under the Texas Securities Act.

## IV.   CONCLUSION

For the reasons set forth above, I recommend that Defendants' motions to dismiss be GRANTED with respect to Count I and Count II and DENIED with respect to Count III and Count IV.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), (C), Federal Rule of Civil Procedure 72(b)(1), and D. Del. LR 72.1.  Any objections to the Report and Recommendation shall be filed within fourteen days and limited to ten pages.  Any response shall be filed within fourteen days thereafter and limited to ten pages.  The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the District Court.

The parties are directed to the Court's "Standing Order for Objections Filed Under Fed. R. Civ. P. 72," dated March 7, 2022, a copy of which can be found on the Court's website.

Dated:  January 31, 2024

Laura D. Hatcher
United States Magistrate Judge

19